IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Timken Gears and Services, Inc. )
                                 )
          Plaintiff,             )
                                 )
                                 )
                                 )
     v.                          ) No. 24 CV 60
                                 )
                                 )
Brad Foote Gear Works, Inc.      )
                                 )
          Defendant.             )

Memorandum Opinion and Order

Plaintiff Timken Gears and Services is a company that manufactures power transmission products. After Timken terminated its sales employee, Joseph White, for violating company policy, White went to work for defendant, Brad Foote Gear Works ("BFGW"), allegedly in violation of White's non-compete agreement with Timken. In this action, Timken sues BFGW for tortious interference with contractual relations (Count I), tortious interference with business relations (Count II), and violation of the Illinois Trade Secrets Act (Count III). Defendant has moved to dismiss the complaint in its entirety. The motion is granted for the following reasons.

The first element of an Illinois claim for tortious interference with contract is "the existence of a valid and enforceable contract between the plaintiff and another." *Indus. Packaging Supplies, Inc. v. Channell*, No. 18 CV 165, 2018 U.S. Dist. LEXIS 93598, at *12-13

(N.D. Ill. June 4, 2018). Whether a restrictive covenant is enforceable is a question of law. *Liautaud v. Liautaud*, 221 F.3d 981, 986 (7th Cir. 2000) (citing *Lawrence & Allen, Inc. v. Cambridge Human Resource Group, Inc.*, 685 N.E.2d 434, 440 (Ill. App. Ct. 1997)). "Because Illinois courts abhor restraints on trade, restrictive covenants are carefully scrutinized." *Id.* (quoting *Prairie Eye Ctr., Ltd. v. Butler*, 713 N.E.2d 610, 613 (Ill. App. Ct. 1999) (alteration removed)). Assuming it is ancillary to a valid employment relationship, a covenant not to compete is reasonable only if it: "(1) is no greater than is required for the protection of a legitimate business interest of the employer-promisee; (2) does not impose undue hardship on the employee-promisor; and (3) is not injurious to the public." *Reliable Fire Equipment Co. v. Arredondo*, 965 N.E.2d 393, 396 (Ill. 2011). It is plain from the face of the restrictive covenant at issue that it fails to satisfy these criteria.

White's employment agreement states:

> All employment with the company is employment at-will. In addition, if for any reason you leave the employ of the Company, you agree, for a period of no less than one year, from the date of your departure, to not work for, directly or indirectly, any competitor of the Company, nor to solicit for employment any current or former Company employees. For purposes of this paragraph, a competitor of the Company is any company whose business includes, in whole or in part, a business model that is focused on industrial, aftermarket, end-user gear supply or gear repair.

Am. Compl. Exh. A, ECF 14-1 at 2. "With respect to the geographic scope of a covenant not to compete, courts generally look to whether the restricted area is coextensive with the area in which the employer is doing business." *Lawrence & Allen, Inc. v. Cambridge Hum. Res. Grp., Inc.*, 685 N.E.2d 434, 442 (Ill. App. 1997). Timken's Amended Complaint does not specify where Timken conducts business, but it alleges that White worked as a Territory Accounts Specialist selling gear boxes and gear repair services in the Midwest Region, primarily in Indiana, Kentucky, Ohio, and Illinois. Yet, the restrictive covenant purports to bar White from competing with Timken anywhere in the world. The complaint offers no factual basis to suggest that the unlimited geographical scope of the covenant not to compete is reasonable.

Other elements of the covenant are equally broad. For example, it purports to prohibit White from working for a Timken competitor in any capacity. Activity restrictions "should be narrowly tailored to protect only against activities that threaten the employer's interest." *Cambridge Eng'g, Inc. v. Mercury Partners 90 BI, Inc.*, 879 N.E.2d 512, 526 (2007). Although Timken might reasonably have required White to refrain from engaging in activities that would threaten Timken's legitimate interests, the restrictive covenant in his employment agreement imposes "a blanket bar on all activities for competitors." *Cambridge Eng'g, Inc. v. Mercury Partners* 90 BI, Inc., 879 N.E.2d 512, 526 (2007). The *Cambridge Engineering* court

held that such a bar was "excessive," because even if the former employee went to work for a competitor "in an entirely noncompetitive capacity, he would still be violating the terms of the contract." *Id*. The same is true here. In addition, the covenant not to compete with Timken defines a "competitor" as any company whose business includes, "in whole or in part," a "business model that is focused on industrial, aftermarket, end-user gear supply or gear repair," and it prohibits White from working "directly or indirectly" for any such company. However construed, these terms facially purport to impose sweeping restraints on White's future employment, and nothing in the amended complaint suggests that such restrictions are necessary to protect Timken's legitimate interests.

Plaintiff's argument that discovery is necessary because "[e]ach case must be determined on its own particular facts," since "[r]easonableness is gauged not just by some but by all of the circumstances," does not alter my conclusion. Resp., ECF 19 at 3 (quoting *Reliable Fire Equip. Co. v. Arredondo*, 965 N.E.2d 393, 394, (Ill. 2011)). At this stage, plaintiff bears the burden of pleading sufficient facts to suggest that the particular circumstances of this case justify the breadth of the restrictive covenant's plain language. Because it has not done so, it is not entitled to proceed on its claim for tortious interference with contractual relations.[1]

---

[1] Although Illinois law grants courts discretion to "modify or 'blue-pencil' an unreasonable agreement in order to make it comport with the law," *Montel Aetnastak, Inc. v. Miessen*, 998 F. Supp. 2d 694,

4

Timken's claim for tortious interference with business expectancy does not depend on the existence of a valid non-compete agreement. *Grako v. Bill Walsh Chevrolet-Cadillac, Inc.*, 229 N.E.3d 869, 876 (Ill. App. Ct. 2023) (elements of claim for tortious interference with prospective economic advantage include "the existence of a valid business relationship (*not necessarily evidenced by an enforceable contract*)") (quoting *City of Rock Falls v. Chicago Title & Trust Co.*, 363, 300 N.E.2d 331, 333 (Ill. App. 1973)) (emphasis added in *Grako*). To proceed on this claim, Temkin must allege: (1) that it had a valid business relationship or a reasonable expectation of entering into a valid business relationship; (2) that BFGW had knowledge of that relationship or expectancy; (3) that BFGW intentionally interfered, inducing or causing a breach or termination of the relationship or expectancy; and (4) that Temkin suffered damages as a result. *Aspen Mktg. Servs. v. Russell*, No. 09 C 2864, 2009 U.S. Dist. LEXIS 112982, at *21 (N.D. Ill. Dec. 3, 2009). The Amended Complaint alleges that Temkin had business relationships with customers that White cultivated on behalf of Timken as its employee, and that Timken lost these customers—and thus hundreds of thousands of dollars in business

---

718 (N.D. Ill. 2014), "Illinois courts have found that extensive judicial reformation of unenforceable post-termination restrictive covenants may be counter to public policy" in that it may encourage employers to draft such covenants as broadly as possible. *Id*. At all events, plaintiff has not asked me to modify the restrictive covenant in White's employment agreement.

revenue—to BFGW after White's departure. Am. Compl. at ¶¶ 25-26, 35-37, 39. Timken also alleges that it contacted BFGW and advised it that White had "taken business from a number of former customers of Timken, and for which he provided services while employed by Timken, including without limitation Kentucky Utilities (Ghent) and the Duke Energy Gibson Power Plant." *Id*. at ¶ 25. Taken together, these allegations satisfy the first, second, and fourth elements of Timken's claim for tortious interference with business relations. But neither these nor any other non-conclusory allegations in the Amended Complaint satisfy the third element: that BFGW "intentionally interfered" with Timken's customer relationships.

As the *Grako* court recently explained:

> To be found liable for tortious interference with prospective economic advantage, a defendant's interference must be intentional and improper. Restatement (Second) of Torts §§ 766B, 767 cmt. a (1979). It is insufficient for a plaintiff to show that the defendant merely succeeded by ending the business relationship or interfering with the expectancy; rather, "purposeful interference"—a showing that the defendant has committed some impropriety—is needed.

*Grako*, 229 N.E.3d at 877. While the Amended Complaint alleges, in conclusory fashion, that BFGW "intentionally aided, abetted, and assisted White" in inducing Timken's customers to terminate their business relationships with Timken, and that its conduct was "willful, malicious, and done in conscious disregard for Timken's rights," this boilerplate lacks the kind of substance needed to suggest plausibly that BFGW committed any impropriety. Accordingly,

the complaint fails to raise Timken's right to relief on this claim
"above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S.
544, 555 (2007).

Finally, the Amended Complaint fails to state a claim for
misappropriation of trade secrets. "To state a claim for
misappropriation of a trade secret under the ITSA, a plaintiff must
show that (1) a trade secret existed,[2] (2) the trade secret was
misappropriated, and (3) the owner of the trade secret was damaged
by the misappropriation. *Covenant Aviation Sec., LLC v. Berry*, 15 F.
Supp. 3d 813, 817 (N.D. Ill. 2014). The Amended Complaint satisfies
the first element—the existence of trade secrets—with allegations
that it possessed "information relating to its product designs,
manufacturing technology, pricing, and sales strategies" is
economically valuable to Timken and is not generally known or
accessible by others, and that Timken takes various steps to maintain

---

[2] The ITSA defines a trade secret as:

> [I]nformation, including but not limited to, technical or
> non-technical data, a formula, pattern, compilation,
> program, device, method, technique, drawing, process,
> financial data, or list of actual or potential customers
> or suppliers, that: (1) is sufficiently secret to derive
> economic value, actual or potential, from not being
> generally known to other persons who can obtain economic
> value from its disclosure or use; and (2) is the subject
> of efforts that are reasonable under the circumstances to
> maintain its secrecy or confidentiality.

765 ILCS 1065/2.

the secrecy of the information. Am. Compl., ECF 14 at ¶¶ 43, 12.[3] But it falters on the other two elements, as it does not plausibly allege any "misappropriation" by BFGW.

Plaintiff points to *Covenant Aviation*, but that case is inapposite. The plaintiff in that case was a company that provided security services to airports, and the defendant was the plaintiff's former president. The plaintiff claimed that the defendant "improperly disclosed" plaintiff's trade secrets to a competitor with which he had become associated, and that he used the information to compete with plaintiff. Observing that one way of establishing "misappropriation" is by showing "unauthorized disclosure," of a trade secret, the court held that the plaintiff's allegations satisfied this element of its claim. *Id.* at 819. Here, by contrast,

---

[3] These steps include:

    a. Requiring Timken employees to enter into agreements to govern employment and post-employment obligations;
    b. Maintaining confidentiality policies governing the use and disclosure of confidential information;
    c. Providing regular training to employees to protect Timken's confidential information;
    d. Requiring rotating/retiring username/password access to Timken's proprietary data;
    e. Requiring use of strong passwords for user accounts on both the file and email servers;
    f. Monitoring suspicious activity; and
    g. Using only secure connections to protect servers (secure VPN connections are required when accessing information remotely).

Am. Compl., ECF 14 at ¶¶ 43, 12

Timken does not allege that BFGW disclosed Timken's trade secrets to anyone, nor does it allege any facts to suggest that BFGW improperly acquired, or used without authorization, Timken's trade secrets—the two other ways the *Covenant Aviation* court recognized for establishing misappropriation. *See id.* (citing *Liebert Corp. v. Mazur*, 827 N.E.2d 909, 925 (Ill. App. Ct. 2005)). To the contrary, Timken alleges affirmatively that White acquired Timken's trade secrets in the normal course of performing his duties, and it does not allege how or even whether any specific trade secrets came into BFGW's possession.

Indeed, the Amended Complaint lacks allegations such as the ones at issue in cases such as *In re Adegoke*, 632 B.R. 154, 161-62 (Bankr. N.D. Ill. 2021), where an employee allegedly misappropriated trade secrets by accessing hundreds of confidential documents on his employer's secure network and "bulk file copied these documents from the network to his laptop" without authorization while he was in negotiations for employment with another firm, for which he began to work shortly thereafter. Similarly, the defendant in *Inmar, Inc. v. Vargas*, No. 18-cv-2306, 2018 U.S. Dist. LEXIS 215827, at *12 (N.D. Ill. Dec. 21, 2018), was an employee who allegedly forwarded numerous emails containing her employer's trade secrets to her private email over the course of several weeks and up to just hours before resigning, then used that information to benefit herself and her new employer shortly thereafter. Nothing in the Amended Complaint

suggests that BFGW engaged in this kind of intentional collection of Timken's confidential information.

At bottom, Timken alleges essentially that White acquired trade secrets in the normal course of his job duties, then left to work for BFGW, which later took business away from Timken. Without more, these allegations are insufficient to raise an inference that BFGW misappropriated Timken's trade secrets. *See Indus. Packaging Supplies*, 2018 U.S. Dist. LEXIS 93598, at *6-7.

For the foregoing reasons, defendant's motion to dismiss is granted. Count I is dismissed with prejudice. To the extent plaintiff believes it can, consistently with its obligations under Fed. R. Civ. P. 11, amend Counts II and III to cure the deficiencies noted in this decision, it must do so on or before July 26, 2024. If no amended complaint is filed by that date, dismissal will become with prejudice as to all counts.

**ENTER ORDER:**

**Elaine E. Bucklo**
United States District Judge

Dated: June 27, 2024

10